2022 IL App (2d) 210264-U
No. 2-21-0264
Order filed June 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-2303 |
| | ) | |
| CONNOR LINDSAY, | ) | Honorable |
| | ) | John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant was proved guilty of aggravated battery where a security officer testified that, while she and another officer attempted to prevent defendant's commission of a retail theft, defendant struck her in the face with his fist, chipping her tooth and causing her lip to swell.  The trial court, as the fact finder, properly rejected defendant's argument that he did not punch the victim and that her injuries were caused when he inadvertently struck her with his elbow as they struggled.

¶ 2    Defendant, Connor Lindsay, appeals from his conviction of aggravated battery (720 ILCS 5/12-3.05(d)(9) (West 2018)).  Defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt.  We affirm.

¶ 3                                I. BACKGROUND

¶ 4    On April 17, 2019, defendant was indicted on one count of aggravated battery (*id.*) and one count of retail theft (*id.* § 16-25(a)(1)). The aggravated battery count alleged that, on November 25, 2018, defendant knowingly caused bodily harm to Kayla Gregg, in that he struck her on or about the face while she was acting as a merchant detaining defendant for an alleged commission of retail theft.

¶ 5    The following evidence was presented at defendant's bench trial. Gregg testified that, on November 25, 2018, she worked for Jewel-Osco as a security officer. At about 8 p.m. that evening, she observed defendant enter the store. Gregg, along with another security officer, A.J. Argyris, followed defendant to the liquor department. Gregg observed defendant in the liquor department for about five minutes as she and Argyris pretended to be shopping together. Gregg was asked about her interactions with defendant while pretending to shop.

> "Q. *** Now—uhm—at any point in time, did you approach the [d]efendant?
>
> A. No.
>
> Q. All right. Now—uhm—well, let we [*sic*] be more specific—uhm—while he was—uhm—browsing in the liquor department, did you go up and say anything to him?
>
> A. No."

Defendant placed three bottles of liquor in his clothing. Gregg followed defendant as he walked toward the exit, passing the last point of purchase. She followed defendant into the vestibule, with Argyris following behind her. Identifying herself as security, Gregg asked defendant multiple times to stop, but defendant did not comply. Gregg stepped in front of defendant and extended her arm in front of her body. When Gregg was asked what happened next, the following colloquy transpired:

"A. He kept pushing toward me and then that is when he—uhm—had like a closed fist but not tight, and he swung at me and hit me in the face.

Q. Okay. Now when you say that he a [*sic*] closed fist but it wasn't tight—uhm—were his fingers closed up as if he was making a fist?

A. Yes.

Q. All right. And when you say it wasn't tight, what do you mean by that?

A. It was more loose, not like you were going to hit a wall, but you were going to hit something.

Q. Okay. And you said that he hit you in the face?

A. Yes.

Q. Where, specifically, in the face?

A. He got my cheek, my lip, and then my tooth.

Q. And when he hit you, did you feel any pain?

A. Yes.

Q. And—uhm—after he hit you, what happened, next?

A. Uhm—that's when [Argyris] grabbed a hold of his arm and I got his other arm and we took him back into the store.

Q. Now, when you went back into the store—uhm—what happened once you got back inside?

A. He was still struggling, he was not happy, and then he did elbow me in the face on accident, but he was still struggling, and then we had to put him on the ground and put him in handcuffs.

Q. And when you say 'he', are you referring to the [d]efendant?

A. Yes, sorry.

Q. Now, you said that he was struggling and elbowed you in the face?

A. Yes.

Q. Okay, and you believe that was an accident?

A. Yes."

Gregg testified that, as a result of defendant hitting her in the face with his loose fist, her lip "swelled" and she had a "chipped tooth." After defendant was placed in handcuffs, Argyris removed the liquor bottles from defendant's pockets.

¶ 6 Gregg identified People's exhibit No. 3 as a DVD containing surveillance video of the incident. The video, which showed portions of the incident from various cameras in the store, was played for the court. The video showed defendant entering the store and proceeding to the liquor department. As the video played, Gregg identified defendant as the individual depicted in the video. Gregg also identified herself and Argyris in the liquor department near defendant. Gregg was asked: "At any point in time, did you have a conversation with [defendant]?" She replied: "He started talking to us—uhm—we were pretending, obviously, to—that we were trying to purchase alcohol and he was giving us recommendations." The video showed defendant concealing liquor bottles in his clothing and walking toward the exit of the store. The video showed the door to the vestibule, but there were no surveillance cameras inside the vestibule. The video showed defendant enter the vestibule, with Gregg and Argyris following behind. The video next showed Gregg and Argyris bringing defendant back into the store (after confronting him in the vestibule, as Gregg testified). Gregg was holding one of defendant's arms and Argyris was holding the other. Gregg and Argyris can be seen struggling with defendant. Gregg identified where on the video defendant can be seen elbowing her in the face.

¶ 7        Gregg identified People's exhibit No. 4 as a photograph of her face taken on November 25, 2018, at the police station.  She identified People's exhibit No. 5 as a close-up photograph of her mouth, depicting her chipped tooth.  She testified that she did not have a chipped tooth before being punched in the face by defendant.

¶ 8        On cross-examination, Gregg testified that, while in the vestibule, which she estimated to be 10 to 12 feet long, defendant punched her in the left cheek area using his right hand.  Gregg did not recover the part of her tooth that had been chipped.  She stated that, after defendant had been taken into custody by the police, she "tasted like pieces in [her] mouth of something, and [she] licked [her] teeth."  She then she asked Argyris to look at her mouth. Gregg also testified that, at the time of the incident, she had a "Labret piercing" under the center of her bottom lip.  When she was asked what that was, the following colloquy transpired:

> "A. It's just right here in the center of my lip, I'm sorry, right underneath the center of my chin, almost.
>
> Q. Okay, so we see like a ball or type object on the outside there, a bar that goes in and then something that clasps on in [*sic*] inside of your lip?
>
> A. It's a flat piece on the inside, yes, but it's a tiny bar."

Gregg could not recall whether defendant was wearing any jewelry on his hands at the time of the incident.

¶ 9        St. Charles police officer Woloszyk testified that, when he arrived at Jewel, he encountered Gregg, Argyris, and defendant just inside the front doors.  Gregg and Argyris told him what had happened.  Defendant also told Woloszyk what had occurred.  According to Woloszyk:

> "[Defendant] had briefly explained, he walked into the store, walked over to the liquor department, selected several bottles of alcohol that he wished to take, attempted to

leave the store[;] however, as he was leaving, he was grabbed from behind and a person announced himself as a security officer, and he was—told him not to resist. I believe he said he was going to resist anyway because he didn't like how they grabbed him—uhm— at some point they wrestled him to the ground, got him in handcuffs, and he made the statement that at some point he may have elbowed them—may have elbowed one of the security officers, however, he did it by mistake."

Woloszyk arrested defendant for retail theft and battery. Woloszyk took pictures of Gregg at the police station to document her chipped tooth.

¶ 10    On cross-examination, Woloszyk testified that Gregg complained of pain, but, other than the chipped tooth, he did not notice any injuries to Gregg such as scratches, scrapes, cuts, swelling, bleeding, or bruising. Woloszyk was asked about the rings that defendant was wearing in court and whether he recognized them. Woloszyk responded: "The rings I see him wear a lot [*sic*], yes." Wolocyzk could not recall whether defendant was wearing the rings when he was arrested and booked on the night of the incident. To refresh Wolocyzk's recollection, defense counsel was permitted to show Wolocyzk a video recording of the police station's booking area. Woloszyk identified himself and defendant in the video. After viewing the video, Woloszyk testified: "Yeah. It does look like he does have [the rings] on." Woloszyk agreed that he saw "rings on both hands," and he agreed that they "are large metal rings." Wolocyzk also agreed that he was not able to determine whether Gregg's tooth was chipped from the "punch" or the "inadvertent elbow" strike.

¶ 11    On redirect examination, Woloszyk testified that he did not know how many rings defendant was wearing on his right hand on the night of the incident. Woloszyk did not know what the rings were made of or whether they were heavy or light. When asked about the shapes

of the rings, he responded: "Many different shapes, I don't know exactly." Woloszyk also testified that he did not know whether defendant was wearing the rings while in Jewel.

¶ 12    The State rested.  Defendant made a motion for a directed finding, arguing that the State failed to prove aggravated battery beyond a reasonable doubt because it did not establish either that (1) defendant punched Gregg or (2) defendant's punch, rather than his inadvertent elbow strike, chipped her tooth.  The trial court disagreed and denied defendant's motion.

¶ 13    Defendant testified that, on the evening of the incident, he was wearing "[e]ight—uhm— heavy metal rings."  He was wearing four rings on his left hand and four on his right hand.  The rings were similar to the rings that he was wearing in court.  He did not have any rings on his thumbs.  Defendant testified that, as he entered the vestibule, attempting to exit Jewel, he was grabbed from behind.  He testified that neither Gregg nor Argyris stepped in front of him in the vestibule.  After they grabbed him, they turned him around, directed him between the dividers in the vestibule, and walked him back into the store.  Defendant testified that, while in the vestibule, he never struck Gregg or Argyris.  According to defendant, as they reentered the store, Gregg "had a very tight grip on [his] wrist and it was very uncomfortable," and defendant "was just trying to get her to loosen up."  Defendant pulled his arm away from Gregg and they "tackled" him to the floor.  Argyris removed one of the bottles from defendant's jacket and then placed him in handcuffs.

¶ 14    On cross-examination, defendant testified that he was wearing, in court, four of the same rings that he was wearing during the incident.  He was wearing, on his right hand, two rings in the shape of skulls and one ring in the shape of a middle finger.  On his left hand, he was wearing a ring in the shape of a large diamond.  He had since lost the other rings worn on the evening of the incident and replaced them with new rings.  Defendant was shown the surveillance video.  He

identified himself in the video and claimed that he could see the rings. The following colloquy transpired:

"Q. Okay. So sir, right now the video is stopped, it's zoomed in on you at 8:16 and 2 seconds depicting your right hand, is that fair to say?

A. Uhm-hum.

Q. Is that a 'yes'?

A. Yes.

Q. All right, and isn't it true that you can't see any rings on your fingers right there?

A. I can see—I can see the stainless color of my rings.

Q. Okay, well, what I'm asking you is: Do you see two skulls on—and a middle finger?

A. No, it's not—

Q. Okay, thank you.

A. —too blurred."

Defendant admitted that Gregg and Argyris identified themselves as security officers when they attempted to stop him. He admitted that he resisted them and struggled to the point that he fell to the ground. He also admitted that he told Woloszyk that he resisted because he did not like the way they grabbed him.

¶ 15    On redirect, defendant testified that he was wearing his rings on the night of the incident.

¶ 16    The trial court found defendant guilty on both counts. The court found Gregg's testimony credible and defendant's testimony incredible. Concerning defendant's rings, the court stated: "I don't believe that the fact that he had rings on and [Gregg] didn't remember that is dispositive of

any issue in this matter. I don't believe I have to find whether he had rings on or not to come to a conclusion in this matter."

¶ 17 Defendant filed a posttrial motion, arguing that he was not proved guilty beyond a reasonable doubt. More specifically, defendant argued that Gregg's testimony was "impeached." According to defendant, Gregg initially testified "that she never approached [d]efendant," but, in subsequent testimony, she testified that she "had a conversation with him discussing various types of liquors and receiving recommendations from [d]efendant." Defendant also argued that Gregg's testimony was not believable, because she testified that she could not recall whether defendant was wearing rings. Defendant proposed that the only logical finding based on the evidence was that defendant was wearing rings. And if defendant, wearing his rings, punched Gregg as she claimed, she would have shown visible "signs of distress, anguish, or *** overt emotion" as she returned with defendant in the store, yet she showed none on the surveillance video.

¶ 18 In denying the motion, the trial court addressed defendant's argument concerning the rings, noting that it was "based on the idea if he hit her with his hands with the rings, there would have been more injury." The court commented that it "couldn't conclusively say [defendant] had rings on at the time or not. The videos themselves, to me, are difficult to determine what's happening." In any event, the court rejected defendant's theory that Gregg would have necessarily suffered greater injury if defendant had been wearing rings. The court stated: "I don't know that that's true. In fact, I would determine that I don't—maybe it would leave an injury, maybe not. It's not clear to me where it landed on this person's face and how it landed, or what angle it landed. None of that is before this court." The court stated that it found Gregg's testimony credible and sufficient to establish defendant's guilt beyond a reasonable doubt.

¶ 19   The trial court sentenced defendant to 30 months' probation on the aggravated-battery conviction and to 24 months' probation on the retail-theft conviction, to be served concurrently. It also ordered defendant to pay $1023.08 in restitution.

¶ 20   This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22   Defendant argues that the State failed to prove him guilty of aggravated battery beyond a reasonable doubt.

¶ 23   In reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.)" *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *People v. Green*, 2011 IL App (2d) 091123, ¶ 19. The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Green*, 2011 IL App (2d) 091123, ¶ 19. The mere existence of conflicts in the evidence does not by itself require reversal, and it is the province of the trier of fact to resolve such conflicts and assess the credibility of the witnesses. *People v. Ellzey*, 96 Ill. App. 2d 356, 358-59 (1968). "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Rodriguez*, 2014 IL App (2d) 130148, ¶ 29. "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *McLaurin*, 2020 IL 124563, ¶ 22. We will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). This standard applies whether the evidence

is direct or circumstantial and whether defendant received a bench trial or a jury trial. *Green*, 2011 IL App (2d) 091123, ¶ 19.

¶ 24    A person commits aggravated battery if he or she knowingly without legal justification causes bodily harm to a merchant who detains the person for an alleged commission of retail theft. 720 ILCS 5/12-3.05(d)(9) (West 2018). Defendant argues that the State failed to prove beyond a reasonable doubt that defendant punched Gregg while in the vestibule. According to defendant, it is more likely that Gregg's injuries were caused by the accidental elbow strike that occurred after defendant was escorted from the vestibule. We disagree.

¶ 25    Gregg testified that she followed defendant into the vestibule, identified herself as store security, and asked him to stop. When defendant did not stop, Gregg stepped in front of him and extended her arm. Defendant then "swung at [her] and hit [her] in the face." Gregg testified that defendant "had like a closed fist but not tight" and that "[h]e got [her] cheek, [her] lip, and then [her] tooth." Gregg further testified that the hit to her face caused a "swelled" lip and a "chipped tooth." Photographs taken after the incident show Gregg's chipped tooth and swelling in her bottom lip. Defendant can be seen on the surveillance video placing bottles of liquor into his pockets. After being detained, bottles of liquor were removed from his pockets. Viewing, in the light most favorable to the State, Gregg's testimony that defendant struck her with a loose fist in the cheek, lip, and mouth—causing swelling and a chipped tooth—we hold that a rational trier of fact could have defendant guilty beyond a reasonable doubt of aggravated battery.

¶ 26    Although defendant acknowledges that the testimony of a single witness can support proof beyond a reasonable doubt, defendant contends that "[Gregg's] impeached and unbelievable testimony does not create an abiding conviction of guilt." We disagree.

¶ 27    First, we reject defendant's contention that Gregg was "impeached." Defendant points to Gregg's testimony concerning whether she spoke with defendant in the liquor department. Defendant argues that "[Gregg] admitted to speaking with [defendant] only after being confronted with the surveillance video." Even a generous interpretation of Gregg's testimony does not support that argument. Gregg was asked on direct: "[D]id you approach the [d]efendant?" and "[D]id you go up and say anything to him? She responded no to each question. Later, on direct, while viewing the surveillance video, Gregg was asked whether she had a conversation with defendant in the store. She replied: "He started talking to us—uhm—we were pretending, obviously, to—that we were trying to purchase alcohol and he was giving us recommendations." The first set of questions clearly focused on whether Gregg approached defendant and initiated conversation with him. Gregg's subsequent testimony that defendant began speaking to her and Argyris by giving them alcohol recommendations does not impeach her prior testimony that she did not "approach the [d]efendant" and that she did not "go up and say anything to him."

¶ 28    Second, we reject defendant's contention that Gregg's testimony that defendant hit her was "incredulous" and "unsupported by the evidence." According to defendant, Gregg's reaction after being hit "was not consistent with being punched in the face." He points to the surveillance video and claims that Gregg (1) was walking "calmly," (2) "was not holding her face," (3) "was not touching her mouth," and (4) "did not appear visibly upset." However, this argument overlooks the fact that, after striking Gregg, defendant continued to resist and had to be physically restrained by both Gregg and Argyris. The surveillance video shows defendant attempting to break free from Gregg and Argyris as they escorted him back into the store. Indeed, defendant admitted that he resisted. We fail to see how Gregg would have been able to hold or touch her face while at the same time using both hands to physically restrain defendant. The fact that Gregg continued to

professionally do her job until defendant was in custody does not render "incredulous" her testimony that defendant struck her in the face. Moreover, defendant's argument assumes that the force of the strike was such that the only natural reaction to it by Gregg would have been to hold her face and be visibly upset. However, Gregg's testimony as to the force of the strike was that defendant's fist "was more loose, not like you were going to hit a wall, but you were going to hit something." In addition, when asked where in the face she was hit, she replied that "[defendant] got [her] cheek, [her] lip, and then [her] tooth." Thus, Gregg's testimony establishes that, rather than striking Gregg directly with full force in her face, defendant's fist instead moved across Gregg's face from her cheek to her mouth area.

¶ 29    In addition, although the parties spend a great deal of time arguing over whether the evidence established that defendant was wearing rings at the time he struck Gregg, we agree with the trial court that the evidence is not conclusive on the point. Although Wolocyzk testified, after viewing the booking video, that defendant appeared to be wearing rings at the police station, it is impossible to tell by the surveillance video whether defendant was, in fact, wearing rings at the time of the offense. If anything, it appears that he was not. Even assuming, *arguendo*, that defendant was wearing rings in the store, Gregg's failure to remember would not render her testimony about being struck unreliable. It is not unreasonable to believe that Gregg could remember the force with which she was hit (*i.e.,* "a closed fist but not tight") but not whether defendant was wearing rings. We also do not agree with defendant's claim that, had he been wearing rings, "the rings would have at least left a mark." As the court noted, without more evidence as to how the punch landed, this is nothing more than speculation. And although defendant testified that he was wearing rings similar to those worn in court, there was no testimony conclusively establishing the rings' physical properties. In any event, it would seem even more

likely that, had defendant been wearing rings, his strike to Gregg's cheek, lip, and tooth, with a lightly closed fist, would have chipped her tooth.

¶ 30    Finally, defendant argues that "the more reasonable explanation for *** Gregg's chipped tooth is that it occurred when [defendant] accidently elbowed her," and he points to the fact that Gregg had a "labret piercing" between her chin and bottom lip.  However, this too is nothing more than speculation.  Gregg testified only that she was elbowed "in the face."  Unlike her testimony about the punch, Gregg did not state exactly where on her face defendant's elbow landed.  The angle of the surveillance video makes it difficult to tell precisely where defendant's elbow landed.  And there was simply no evidence to support defendant's theory that the "labret piercing" chipped Gregg's tooth.  Defendant also argues that the fact that Gregg did not notice that her tooth was chipped until after defendant was detained supports his argument that the accidental elbow strike chipped the tooth.  We disagree.  The elbow strike occurred less than 30 seconds after the punch to the face.  In between those two events, Gregg was attempting to restrain defendant, who was actively resisting.  It is not unreasonable that Gregg would not notice the chip until after the activity subsided.

¶ 31    Based on the foregoing, we cannot say that the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt.

¶ 32                                  III. CONCLUSION

¶ 33    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 34    Affirmed.